UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

RANDY L. JONES,                          )
                                         )
        Petitioner,                      )
v.                                       )        No. 4:06-cv-65
                                         )        *Mattice/Carter*
VIRGINIA LEWIS, Warden                   )
                                         )
        Respondent.                      )

# M E M O R A N D U M

Randy L. Jones ("Petitioner") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Court Doc.1). In 1997 Petitioner was convicted by a jury in Grundy County, Tennessee Circuit Court on two counts of first degree premeditated murder. Petitioner received two consecutive life sentences. He now petitions this Court for review of those convictions. He bases his request for relief on claims of denial of his constitutional right to effective assistance of counsel, denial of due process, prosecutorial misconduct, denial of right to self-representation, and a claim of cumulative error. (Court Doc. 1).

Virginia Lewis ("Respondent"), Warden of the facility where Petitioner is housed, has filed a response to Petitioner's petition for writ of habeas corpus (Court Doc. 11), which conforms with Rule 5 of the Rules Governing Section 2254 cases in the United States District Courts, and requests the dismissal of Petitioner's procedurally defaulted claims and summary judgment on his remaining claims, on the grounds that the state court conclusion does not violate the standard set forth in *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (Court File No. 11). Petitioner has responded to Respondent's Answer (Court Docs. 36 & 37) and the Court has construed the Answer as a motion for summary

1

judgment.

After considering the filings of Petitioner and Respondent, the record of the state proceedings, and the applicable law, the Court will **GRANT** Respondent's motion for summary judgment (Court Doc. 11) and **DISMISS** Petitioner's § 2254 petition (Court Doc. 1).

## I.   STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254.  Under Rule 8 of the Rules Governing Section 2254 Cases in the United States Districts Courts, the Court is to determine, after a review of the response, the transcript, record of state court proceedings, and the expanded record, whether an evidentiary hearing is required.  If a hearing is not required, the district judge may dispose of the case as justice dictates.  After carefully reviewing the relevant materials, the Court finds it unnecessary to hold an evidentiary hearing.

Federal courts review decisions of the state courts pursuant to 28 U.S.C. § 2254(d) which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). That statute generally limits a federal district court's jurisdiction to review habeas claims on the merits.  In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2)

"resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(1) and (2).

A state court's determination of a factual issue shall be presumed to be correct and the presumption of correctness can be only rebutted by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1).  Credibility findings made by state courts are entitled to a presumption of correctness.  *McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied,* 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated*, 545 U.S. 1151 (2005); *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990).

II.    **PROCEDURAL HISTORY**

On January 11, 1997 Petitioner was convicted by a jury of two counts of first degree premeditated murder.  Petitioner was sentenced by the trial court to two consecutive life sentences.    Petitioner's convictions were affirmed on direct appeal but the appellate court reversed the trial court's order of consecutive sentences and remanded for a resentencing hearing.  Petitioner was denied permission to appeal by the Tennessee Supreme Court on February 14, 2000.  *State v. Jones*, 15 S.W.3d 880 (Tenn. Crim. App. 1999)

Petitioner filed a *pro se* petition for state post-conviction relief on December 15, 2000 (Addendum No. 11, pp. 1-26).  He later filed a second *pro se* post-conviction petition, and several amended petitions were filed by Petitioner or one of the attorneys representing him during the state post-conviction proceedings (Addendum No. 11, pp. 94-112; 144-147; 163-203; 237-241; and 258-261).  The state post-conviction court conducted an evidentiary

hearing and entered an order denying relief. Petitioner elected to proceed *pro se* on appeal. The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. Permission to appeal was denied by the Tennessee Supreme Court on September 15, 2006. *Jones v. State*, 2006 WL 1626931 (Tenn.Crim.App. June 9, 2006), *appeal denied* (Sept. 25, 2006). On October 25, 2006, Petitioner filed the instant § 2254 petition.

## III. FACTUAL BACKGROUND

The facts of the crime will be taken from the state appellate court opinion on direct review. The facts presented in the state post-conviction hearing will be taken from the transcript of that proceeding.

### A. Trial Facts

The following facts are taken from the Tennessee Court of Criminal Appeal's opinion affirming his convictions for the first degree premeditated murder of Buster Dewey Caldwell ("Mr. Caldwell") and Marsha Sue Green Anderson ("Ms. Anderson"):

> During the early afternoon of November 14, 1995, Mike Kirk, a criminal investigator from the Grundy County Sheriff's Department, was dispatched to the Marshal Anderson residence in Altamont. When he arrived at the scene, Officer Kirk saw two bodies through an open front door. Sheriff Robert Meeks later identified the victims as Buster Caldwell and Marsha Anderson.
>
> TBI Special Agent Raymond DePriest, who conducted an analysis of the crime scene determined that the murders occurred while the victims were eating dinner and watching television. The Anderson residence had been ransacked. No DNA evidence was obtained from the scene and no blood evidence linked the defendant to the murders.
>
> Don Carmen, a ballistics expert for the TBI, found a box of .32 caliber H & R magnum cartridges at the residence which were consistent with the bullets removed from Ms. Anderson. Agent Carmen testified that this ammunition is typically used in a .32 H & R magnum revolver manufactured by New England Firearms. While authorities never recovered the revolver used to

4

shoot Ms. Anderson, Agent Carmen found a 20-gauge Winchester shotgun shell wad on the floor and another live Winchester shotgun shell in Caldwell's front pants pocket. Although he could not link the gun to the murder scene through forensic evidence, Agent Carmen identified a 20-gauge single shot shotgun as the likely murder weapon and determined that Caldwell had been shot from a distance of four to twelve feet.

Dr. Charles Harlan, medical examiner for Robertson County, testified that Caldwell died as the result of a shotgun wound to the chest which penetrated his lung. He stated that Caldwell would have been able to move and speak for three to six minutes. Dr. Harlan testified that Ms. Anderson, who had been shot three or four times in the head, died as a result of a fatal gunshot to the back of her head. Alcohol and Valium was detected in the blood of both victims.

TBI investigator Larry Davis testified that on November 15, 1995, Wayne Fulfs turned in a 20-gauge shotgun thought to be the Caldwell murder weapon. He also found a handwritten note in Ms. Anderson's kitchen which provided as follows: "B knows who got TV and T. Best buddy R.J. and M.N. Your Pal." Agent Davis had questioned the defendant shortly after the murders. The defendant stated that he and Caldwell had been friends and that on Sunday, November 12, 1995, Caldwell's truck had been stolen and his house robbed. The defendant claimed that, while he was at Slatton's pool hall in Griffith's Creek, he learned where the truck could be found and on the day after the robbery, he had asked Freddie Meeks, a wrecker operator, to tow the truck back to Caldwell's. The defendant claimed that Caldwell had accused Bob Rollins of the theft. The defendant explained the handwritten note as follows:

[T]he note . . . said it was Michelle Norris [the defendant's former girlfriend] and either Baby John or me one, that it had the initials, it didn't say exactly who. [Caldwell] came over to Freddie Meeks' and I was [there] and he showed me the note and he said read this Randy and I read it and said Buster you know where I am at, I am down Neecie's I been down there weeks, he said Randy I know you have, he said whoever done this is trying to set you up. . . .

After the truck was towed to Caldwell's residence, the defendant went to the residence he shared with his girlfriend Denise "Neecie" Laymon, where he ate and went to sleep. The defendant said that on the next morning, November 14, he phoned Caldwell but received a busy signal. He claimed that during the afternoon, he and Fulfs traveled to Whitwell to purchase some tires from Danny Jones and that when he returned around 4:00 P.M., he learned that Caldwell and Ms. Anderson had been killed. The defendant denied any part in the murders and denied owning any weapons. When

asked if his fingerprints would be found on the shotgun, the defendant had replied in the negative.

Freddie Meeks, a wrecker operator, testified the defendant employed him to tow Caldwell's truck. The defendant was accompanied by Caldwell and Ms. Anderson. Meeks stated that Caldwell's truck was not visible from the road but that the defendant was able to direct him to its location. Meeks recalled that Caldwell had confronted the defendant with the note and had asked him how he knew where to find the truck.

Wayne Fults, a first cousin to the defendant, acknowledged a prior conviction for burglary and other charges currently pending against him in Grundy County. He testified that three days before the murders he overheard the defendant threaten to kill Caldwell because he had been "telling his mother stuff and she was telling the cops." Fults stated that Tim Jones, the defendant's brother, also heard the defendant make the threat. On the morning of November 14th, before the bodies were discovered, Fults found a shotgun in a car at Whispering Pines, a plot of land owned by the defendant's family. Fults took possession of the weapon and later that morning, when he and his wife, Deborah, met the defendant and Ms. Laymon, the defendant had asked him if he had found a gun. The defendant told him that the gun needed to be "melted down" because "he'd shot somebody with it" and Ms. Laymon confirmed, "Yeah, he did, he really did." That afternoon, the defendant told Fults that he shot Caldwell and that DeWayne Asberry shot Ms. Anderson. The defendant revealed that Ms. Laymon was present during the murders. Fults recalled that the defendant also made incriminating statements while visiting Dave and Charlotte Fults. The defendant had stated that "he needed to find that gun. It needed to be got rid of." Fults testified that he turned over the shotgun to Agent Davis on the day after the murders and that for several days after the murders, the defendant had called ten to fifteen times per day to ask if there had been any information announced on the police scanner. Fults denied having cleaned the gun before giving it to Agent Davis and denied having tried to sell the weapon to Donnie Nolan.

Deborah Fults testified that the day the bodies were found, her husband went to Whispering Pines and returned in possession of a shotgun. Ms. Fults recalled meeting the defendant and Ms. Laymon along the road and that the defendant asked whether Fults had found a gun at Whispering Pines and also remarked that "whoever had got it needed to know that he had shot somebody with it." Ms. Fults corroborated her husband's testimony regarding the phone calls from the defendant over the next several days. On cross-examination, Ms. Fults estimated when her husband went to Whispering Pines, he was away for thirty minutes. She stated that Whispering Pines was ten miles from her house.

Mary Perry testified that she was at David and Charlotte Fults' residence on the date of the murders when the defendant arrived. She recalled that the defendant warned Wayne Fults that "if he had . . . got a gun out of there that he needed to get rid of it" because "it could be caught up in something." Apparently, the state expected Ms. Perry to repeat a prior statement she made to Agent Davis that the defendant had said, "it could be caught up in a murder" and that the gun had been used as "a murder weapon." When the state was permitted to confront Ms. Perry with the content of the prior inconsistent statement, she maintained that her in-court testimony was accurate and that the defendant had simply said "they had shot a gun the night before." She testified that the defendant had appeared nervous but contended that he had never admitted to committing a murder. She also observed that Wayne Fults' reputation for truthfulness "ain't too good."

Charlotte Fults overheard the defendant using the telephone the day Wayne Fults found the shotgun. She testified that she heard the defendant say, "You better get rid of the gun, or if, if you get caught with it, you're liable to be caught up in a shooting or a murder or something to that." She recalled that the defendant had indicated that the gun was missing from Whispering Pines. She described the defendant as acting "strange." On cross-examination, Charlotte Fults acknowledged that she never heard the defendant confess that he had committed a murder.

Danny Jones, Jr., first cousin to the defendant, testified that he was working in Whitwell on the afternoon of the murders when the defendant approached him and said, "There's some people killed out on the pipeline at Altamont," or "they had found some people dead." While he recalled asking the defendant what had happened, Jones "wasn't really for sure" how the defendant responded. The state had expected him to confirm a prior statement to TBI investigators that the defendant admitted "he had killed the people." While Danny Jones acknowledged that he might have told investigators that the defendant had confessed to killing the victims, he contended that his prior statement was not accurate. Thereafter, the trial court refused to permit the state to question him further about the prior statement and instructed the jury that it could not consider any testimony regarding the prior statement. Danny Jones went on to testify that Wayne Fults had been angry with Caldwell because Caldwell had "ragged out" his Mustang and then reneged on their agreement to trade vehicles. Danny Jones also testified that after the theft of Caldwell's truck, he had driven the defendant to Slatton's pool hall.

James Caldwell, the victim's uncle, identified the shotgun obtained by Agent Davis as being "just like" the one he shared with Buster Caldwell. He testified that on the night before the murders, Buster Caldwell had borrowed his 20-gauge single-shot shotgun and two Winchester shells.

Bradford Meeks testified that sometime in October of 1995, Ms. Anderson had purchased a model R 73 New England Firearms .32 caliber magnum revolver and a fifty-count box of .32 caliber shells at his hunting supply store.

Jason Slatton, who acknowledged a prior conviction for attempted theft for which he is currently serving a three-year sentence in the community corrections program, testified that he worked at a pool hall in Griffith's Creek and knew both the defendant and Caldwell. Slatton recalled that on the day before the bodies were discovered, the defendant had stopped by the pool hall shortly after dark and had discussed the location of a pickup truck that Slatton had seen abandoned nearby. He recalled that the defendant was accompanied by two women and did not remember seeing Danny Jones at the pool hall that night.

Bob Rollins, who acknowledged a prior felony conviction for receiving stolen property, testified that he had loaned Caldwell one hundred dollars several days before the shootings and Caldwell had not repaid him. Rollins stated that after dark on the evening before the bodies were discovered, Caldwell and Ms. Anderson had stopped by his residence. He believed both had been drinking and were armed with a shotgun and a pistol. Rollins testified that Caldwell informed him that his television and truck had been stolen.

Teresa Blubaugh, Ms. Anderson's daughter, testified that in September of 1995, her mother had separated from her husband, Bob Anderson. Ms. Blubaugh recalled that Bob Anderson had threatened to kill her mother.

Donnie Nolan, who acknowledged prior felony convictions for stealing cars and possession of marijuana, claimed that on the night before he heard about the murders, Wayne Fults came to his house and offered to sell him a 12-gauge shotgun. While Nolan conceded that he never saw the weapon, he observed Fults "duck down" when a car passed, as though he "didn't want nobody to see him." Nolan described Fults as "acting real scared."

Regina Hood testified that she went to Ms. Laymon's residence on the date of the murders and asked her to go shopping. She recalled that Ms. Laymon directed her to drive to Ms. Anderson's house. From the driveway, Ms. Hood saw the front door open and the bodies of the victims on the floor. She left immediately. Ms. Laymon telephoned the sheriff's department from a nearby house.

Denise Laymon testified that she and the defendant were not romantically involved at the time of trial but that, in the fall of 1995, the defendant was living with her and her daughter. She recalled that during the late evening of November 13th, the defendant, Caldwell, and Ms. Anderson, arrived at her

mobile home. She stated that the victims had been drinking and remembered that shortly thereafter DeWayne Asberry arrived. Sometime after midnight, the victims left. Ms. Laymon testified that she then retired to her bedroom and the defendant followed a few minutes later. Asberry was permitted to sleep on the couch. Ms. Laymon testified that she was quite sure that neither the defendant nor Asberry left her trailer during the night. She acknowledged that the next morning, she and the defendant went to Whispering Pines where they met Wayne and Deborah Fults along the roadway. Ms. Laymon recalled that she was driving and listening to the radio and that the defendant got out of the car to talk to Fults. She denied hearing the defendant admit that the he had shot someone and denied saying, "Yeah, he did. Yes, he did." She stated that in the afternoon, she and Ms. Hood decided to go shopping and she intended to ask Ms. Anderson to accompany them. Ms. Laymon suggested they "get out of there" when they arrived at the Anderson residence and saw the victims. She telephoned the sheriff at a nearby house.

Tim Jones, the defendant's brother, testified that he did not recall riding in the car with Wayne Fults or hearing the defendant threaten anyone.

The thirty-year-old defendant testified that he had previously pleaded guilty to several offenses, including burglary of a business, auto theft, and reckless endangerment. He acknowledged that he had been acquainted with Caldwell for six months and Ms. Anderson for a few weeks. The defendant recalled that on November 12, 1995, he had given them some furniture from Whispering Pines because Ms. Anderson's house had been "cleaned out." He claimed that on the next day, he and the victims had returned to Whispering Pines for some lamps and Caldwell had informed him that his truck and television had been stolen. The defendant stated that he met Danny Jones later, told him that someone had stolen Caldwell's truck and television, and asked for a ride to Slatton's pool hall and pawn shop. The defendant claimed that he thought that the television might have been pawned there. The defendant stated that he spoke with Jason Slatton, who directed him to a truck that had been abandoned a short distance away. The defendant testified that he found the truck as he returned to Ms. Laymon's trailer, informed the victims, and arranged for Freddie Meeks to "pull" the truck. While he conceded that the victims followed the wrecker to the stolen truck, the defendant denied that Caldwell had accused him of the theft or that they had argued about how he had learned where the truck was located. The defendant claimed that Caldwell was laughing when he approached him with a pistol and a note implicating the defendant in the theft. The defendant testified that after towing the truck, he and the victims bought some beer and went to Ms. Laymon's trailer. He stated that Asberry arrived unexpectedly

and, shortly past midnight, the victims left. The defendant claimed that was the last time he saw the victims alive.

The defendant testified that he ate a can of soup before going to sleep and denied leaving Ms. Laymon's trailer that night. Although he was not positive, he stated that he did not believe that Ms. Laymon or Asberry left either. He claimed that he attempted to call the victims several times the next morning and received a busy signal.

The defendant recalled that he and Ms. Laymon drove to Whispering Pines and met Wayne and Deborah Fults along the roadway. The defendant stated that Fults asked him if he had been down to Whispering Pines earlier in the day and that he had replied in the negative. He contended that Fults admitted that he had robbed a house and had hidden some guns at Whispering Pines and that Fults asked if he had taken the guns, to which the defendant said no. He claimed that shortly after noon, Wayne Fults called and asked him whether David or Leonard Fults had been to Whispering Pines and taken the guns. Later, when he was at David Fults' house, the defendant called Wayne Fults and informed him that neither David nor Leonard had been to Whispering Pines and knew nothing about the guns. The defendant claimed that Wayne Fults then directed him to warn them, "if anybody gets caught with [those guns], they'll get caught with a charge." He explained that as he was leaving David Fults' residence, he did remark, "Oh, yeah, if anybody gets caught with them guns they'll catch a charge."

The defendant contended that later that afternoon, while he and Wayne Fults drove to Whitwell to talk to Danny Jones, they overheard a police scanner report that a doctor had been called to the Company Farm. The defendant maintained that Wayne Fults then remarked, "Well, they found somebody dead." The defendant described Fults as being "in a panic." They took an alternate route home.

On cross-examination, the defendant maintained that Wayne Fults was a "rogue and a thief" but acknowledged that he and Fults had been convicted of a joint burglary in the past. The defendant contended that the testimony of Freddie Meeks, Jason Slatton, Danny Jones, and Charlotte Fults was mistaken and that Wayne and Deborah Fults had lied. He claimed that he did not leave Ms. Laymon's trailer on the night the victims were murdered and denied either going to Ms. Anderson's house or shooting Caldwell with a 20-gauge shotgun. He also denied putting the shotgun in the blue Lincoln Continental at Whispering Pines and denied telling Fults that he was angry with Caldwell for statements Caldwell made to his mother regarding activities of the defendant. The defendant acknowledged that he was on parole at the time of the offenses.

Wayne Fults, who was recalled by the defense, testified that while he and the defendant were in Whitwell to see Danny Jones, he "thought" that he heard over the police scanner that Lana Morrison, a former girlfriend of the defendant, had reported to the sheriff's department that someone had "taken a shot at her." When Fults told the defendant the news, they "hightailed it" out of Whitwell, and took an alternate route home. Fults denied concocting that story to conceal his nervousness about the discovery of the victims at Company Farm. He denied having stolen the guns and hiding them at Whispering Pines.

Lana Morrison testified as a defense witness that the defendant returned to live with her on the day after the murders. She stated that she had a police scanner in her trailer at the time and implied that there would have been no need for the defendant to call Wayne Fults to get information about the murder investigation. On cross-examination she recalled that, during the evening of November 12th, someone shot into her trailer and she had notified the sheriff but no one had investigated.

There were no records in the sheriff's department of a dispatch for a shooting incident at the Morrison residence on the day Wayne Fults claimed to have heard the report.

Sheriff Meeks, called by the state in response to Ms. Morrison's claims, disputed the veracity of her testimony. He testified that he had investigated the shooting incident at Ms. Morrison's trailer, talked with Ms. Morrison and her mother, and inspected the bullet holes.

The parties stipulated that on November 10, 1995, the victim Anderson sold a piece of real estate and received $241.28 in cash and a $3,000.00 check. On September 20, 1995, she sold some farm equipment and was paid $3,200.00 in cash. On September 19, 1995, she sold some livestock for $3,000.00, paid by check. On September 15, 1995, she sold livestock for $600.00 cash.

*State v. Jones*, 15 S.W.3d 880, 884 -888 (Tenn.Crim.App.,1999).

### B.   Post-Conviction Hearing Facts

Four witnesses testified during Petitioner's state post-conviction proceeding.

Charlotte Fults and her husband, David Fults who is Petitioner's uncle, were called to

testify regarding an alleged conflict of interest on the part of Petitioner's trial counsel, Mr.

Paul Cross ("Mr. Cross"). Petitioner claims his trial attorney, Mr. Cross, had a conflict of interest because he represented Charlotte Fults, a witness for the prosecution at Petitioner's trial, both prior and subsequent to Petitioner's trial.

David Fults testified that Don Earle executed a search warrant while he was at work and instructed his wife to tell him to appear at his office in Winchester that evening (October 22, 1996) because he found marijuana on his property. After calling Mr. Cross, Mr. Fults, his wife, and Mr. Cross appeared at Don Earle's office. Mr. Fults testified that he lacked an education but he brought Mr. Cross down there to "defend" him and paid him a hundred dollars to represent him and his wife though neither of them were charged or arrested at that time. They spoke with Don Earle and left and were subsequently indicted on the charges in March of 1997, a couple of months after Petitioner's trial. An attorney from McMinnville represented Mr. Fults and Mr. Cross represented Mrs. Fults (Addendum 13, pp. 32-43).

Charlotte Fults testified that Don Earle executed a search warrant in October of 1996 at her residence while she was present and he discovered marijuana during the search. Although the search warrant named her husband, she and Paul Cross accompanied her husband to Winchester to meet with Don Earle. Mrs. Fults testified Mr. Cross was present to advise them. Although Mrs. Fults was not fingerprinted, Mr. Earle did speak with her during this meeting. Mrs. Fults did not remember talking with Mr. Cross about the marijuana case further until after she was indicted.

Mr. Cross was appointed to represent defendant on September 20, 1996, and the trial took place in January of 1997. Mr. Cross did not recall talking to the Fultses prior to when he opened Charlotte Fults' file on April 3, 1997. Although Mr. Cross had no

recollection of meeting the Fultses in Winchester, he did not deny that such a meeting occurred. Mrs. Fults was indicted in March of 1997 and her case was eventually dismissed.

Mr. Cross testified that even if he had gone to Winchester as the Fultses testified, upon receiving the witness list in Petitioner's case he would not have thought he may have a conflict because "by that point in time it was obvious to me that not only Charlotte Fults, but others in this as well, were really trying to be as helpful as they could to Randy." (Addendum No. 13, pp. 57-68).

In response to a question as to why he did not cross-examine Mrs. Fults on the marijuana case, Mr. Cross testified that he did not believe he could question her about the possibility of a future arrest. Moreover, his recollection was that Charlotte Fults was doing everything she could, without being dishonest and crossing the line into perjury, to help Petitioner. In Mr. Cross's judgment, as trial counsel he did not think he should question her about being drunk and afraid of the police as an excuse to retract her statement. However, the trial transcript reflects that he did cross-examine her about the fact that she and the group of people she was with had been drinking. In addition, during cross-examination she confirmed she never heard Petitioner say he had shot or murdered anyone (Addendum No. 13, p. 75). Mr. Cross testified he did not view Charlotte Fults as an unfavorable witness and he believed she was doing all she could to help Petitioner and not to hurt him. Mr. Cross testified that, even if he had remembered going to Winchester with the Fultses, he would not have perceived a conflict.

Mr. Cross was then questioned about the direct-examination of Mary Perry and Danny Jones. These two witnesses testified during Petitioner's trial and were reluctant to

testify consistently with their pre-trial statements, but Mr. Cross did not notify the State that they were equivocating on the initial statements they made to law enforcement. Mr. Cross testified he did not think it was a situation where he should have notified the prosecution. Rather, the prosecution should not have been allowed to impeach the witnesses with their prior statements because they had not lied but instead had said they did not remember saying what the police had written down in the statement and were really just reluctant to give testimony. Mr. Cross testified that both witnesses were "wobbly" on their testimony and he really was not sure what they were going to say.

Mr. Cross testified he was caught by surprise when Wayne Fults testified Petitioner's girlfriend confirmed his claim that he had killed someone and therefore, since the damage was already done and he did not want to enhance that testimony by making an issue of it, he did not object. When asked why he objected to the same statement when Deborah Fults testified about it, he said his only explanation is that "in the heat of a trial you have to make snap decisions . . ." (Addendum No. 13, pp. 76-100). Furthermore, Mr. Cross called Neecie who testified she did not hear Petitioner say he killed someone and she never made the statement attributed to her by the Fultses.

Mr. Cross testified about the "Note" coming in while he was distracted. When asked if he had prepared a defense, he responded, "[i]t's one of those things you couldn't do anything with if it came in." Mr. Cross explained that Petitioner testified they were friends but that he had some uneasy feelings about making Petitioner and the victim appear to be too good of friends.

Mr. Cross acknowledged he interviewed Crystal Nunley but, because he questioned her credibility, he decided not to use her as a witness.

In response to a question asking why he presented an alibi defense and then argued to the jury that you could not completely eliminate the possibility that Petitioner was involved, he responded that there was evidence pointing in both directions, so he acknowledged the conflicting evidence but argued the better-reasoned position was to vote "not guilty."

The last witness to testify was Crystal Nunley. She testified she had only met the victim once before his death but he called her later that day complaining that unidentified people that she described as "they" were blaming Petitioner for stealing his truck. According to Ms. Nunley, the victim was mad because Petitioner had been with him all day. She further testified the victim thought it was funny that they were blaming Petitioner.

IV.     **ANALYSIS**

Petitioner has raised numerous claims in his habeas petition which were determined to be waived by the state appellate court. Respondent argues that the Court should not reach the merits of the claims the state court deemed waived as those claims are barred from federal review. As explained below, the claims deemed waived by the state post-conviction court are procedurally barred in this habeas corpus proceeding.

Initially, the Court observes that Petitioner identifies seven issues which include numerous sub-claims. Further, the Court observes that Petitioner has raised some issues which were deemed waived by the state court and has failed to raise some issues which the state court adjudicated. Those issues that were deemed waived by the state court and those claims that Petitioner has not presented to the state courts are procedurally barred from habeas review.

Nevertheless, and although Petitioner has failed to raise some of the claims

15

addressed by the state court, for the sake of clarity and out of an abundance of caution, the Court will address the claims that the state appellate court addressed. After adjudicating those claims which have been properly exhausted, the Court will address the procedural default and actual innocence issues and explain why the claims deemed waived or defaulted in state court are procedurally barred from habeas review.

Accordingly, the Court now turns to those claims adjudicated by the Tennessee Criminal Court of Appeals post-conviction. The Court will address Petitioner's claims in the order they were addressed by the Tennessee Criminal Court of Appeals.

### A.      Denial of Right of Self-Representation

Petitioner contends he requested to represent himself at trial and at the motion-for-new-trial hearing but that both requests were denied. Additionally, Petitioner claims his right to due process was also violated when the state post-conviction court refused his requests to make an offer of proof and to represent himself, following appointed counsel's unwillingness to argue all claims espoused by Petitioner. Thus, argues Petitioner, because counsel did not abide by his wishes, "he still had the right of due process to relieve **<u>UNWANTED</u>** counsel[,] invoke his common law right to self-representation . . . [,] make an offer of proof which clearly established violations of issues resolved on the merits, especially, to prevent his issues from being waived and procedurally defaulted." (Court File No. 1, p. 18).

The Court has divided this claim into three categories: self-representation at trial, motion for new trial, and post-conviction proceedings.

16

1.    *Self-Representation at Trial* (Habeas Petition Issue 7)

The record reflects that Petitioner appeared before the Grundy Circuit Court for arraignment on September 20, 1996.  More than one month prior to his arraignment, he had filed a motion to waive counsel and, at his arraignment, he informed the court that he had filed such a motion. The trial judge explained that in a murder case, he was not inclined to let him waive counsel; that, at "this" time he was going to appoint counsel; but that he, nonetheless, might let him assist in his own trial.  The trial judge asked Mr. Cross about his willingness to serve as Petitioner's appointed counsel, but the prosecutor interjected that Petitioner was telling the court he wanted to forgo appointed counsel and represent himself.   Responding to the trial judge's further inquiry, Petitioner related that he was in the process of hiring counsel, although he had not yet hired anyone and lacked the financial means to do so.

The trial judge appointed Mr. Cross.  The trial court also informed Petitioner that if he hired a lawyer to represent him, Mr. Cross would be relieved of his obligation to represent him.  Mr. Cross entered a not guilty plea on Petitioner's behalf and the trial judge advised Petitioner:

> I'm not telling you that you can't represent yourself, but I certainly would caution you not to do that, but Mr. Cross at this point is going to be your attorney.  If you decide for some reason you think you can do a better job than he can and I would say that you could not, but if you decide that you wanted to do that, he would be appointed your, what we call, elbow counsel, which means that he would be at counsel table, but I would suggest that it's in your best interest to use his services in the defense of your case . . .

(Addendum No. 11, pp. 216-218;220); *Jones v. State*, 2006 WL 1626931, at *9 (Tenn.Crim.App. 2006).   At a subsequent motion hearing on October 29, 1996, the prosecutor brought up the subject of Petitioner representing himself.  Mr. Cross stated,

without any objection from Petitioner, that he was representing Petitioner (Addendum No. 14, p. 4). Mr. Cross then proceeded to represent Petitioner throughout the trial with no objection by Petitioner until the day of the hearing on the motion for new trial.

This claim was addressed by the state post-conviction trial court, which found that Petitioner did not clearly and unequivocally exercise his right to proceed *pro se*, and concluded that by permitting the case to go to completion without raising the matter again he waived that right. The state appellate post-conviction court also addressed the claim and cited to *Faretta v. California*, 422 U.S. 806, 819 (1975), for its holding that "[a] criminal defendant has a right to be represented by counsel or to represent himself and proceed *pro se* without the assistance of counsel." *Id*. at 819. The appellate court, based on its review of the arraignment transcript, concluded that Petitioner quite clearly had been informed of his right to self-representation, had also been advised on the attendant perils of self-representation, and did not unequivocally assert his right to self-representation. That court also pointed to the October 29, 1996 hearing, during which Petitioner was silent when asked whether he was going to represent himself and remained silent when Mr. Cross stated that he was representing him (Addendum No. 15, p. 4). Alternatively, the Court of Criminal Appeals observed that even if Petitioner's conduct was viewed as triggering his right to self-representation, he had waived this right when he failed to reassert a desire to proceed *pro se* and instead permitted Mr. Cross, without objection, to participate at trial on his behalf. *Jones v. State*, 2006 WL 1626931, * 10 (pointing out that "'an unequivocal request may be waived by subsequent words or conduct.'")(citation omitted).

This Court is required to determine if the state court decision is contrary to or involves an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. As the state court indicated, the well-established law which governs this issue is found in *Faretta v. California*, 422 U.S. 806 (1975). After noting that a person accused of a felony has a constitutional right to be represented by counsel and a right to have an attorney appointed for him if he cannot afford counsel, the *Faretta* court held that the Constitution also guarantees a criminal defendant the right of self-representation and that right is violated if a state appointed attorney is forced on an accused. However, certain safeguards are required; prior to allowing an accused to represent himself, a court must establish, on the record, that a defendant is knowingly and intelligently relinquishing his right to counsel and the benefits thereof. *See Moore v. Haviland*, 531 F.3d 393, 402 (6th Cir. 2008)(quoting *Faretta*, 422 U.S. at 835)("For any such waiver to be effective, the accused 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'").

Nevertheless, a person may not engage in self-representation and, at the same time, assert his right to counsel because the Constitution does not guarantee a right to "hybrid representation." *United States v. Moseley*, 810 F.2d 93, 97-98 (6th Cir. 1987), *cert. denied*, 484 U.S. 841 (1987), *see also United States v. Cromer*, 389 F.3d 662, 682 n. 12 (6th Cir. 2004) ("It is well settled that there is no constitutional right to hybrid representation.")

That is exactly what Petitioner has attempted to do in this case.   Petitioner stated he waived counsel, but also stated that he was in the process of hiring an attorney.  This is not an unequivocal waiver of counsel.  Petitioner cannot have it both ways.  The state court explained to him that it was appointing Mr. Cross to represent him, that it would relieve him of his duties when Petitioner hired counsel and that if he decided that he really did want to represent himself, Mr. Cross would be appointed as elbow counsel.  Moreover, Petitioner abandoned his pursuit of self-representation, despite filing numerous *pro se* motions, none of which sought to waive his right to counsel, until after his verdict was rendered and he stood convicted of the murders.

The record reflects Petitioner was informed of his right of self-representation; that he did not unambiguously assert that right; that appointed counsel was not forced on him against his will; and that, by his conduct, he chose to exercise his right, as an indigent defendant, to an attorney paid for by the State.  Accordingly, the state court's decision making these findings was not contrary to or an unreasonable application of *Faretta*—the seminal Supreme Court precedent on self-representation—nor based on an unreasonable determination of the facts.  Thus, this claim will be **DISMISSED**.

    *2.*   *Self-Representation at Motion for New Trial* (Habeas Petition Issue 5(b))

Mr. Cross filed  a motion for new trial on January 28, 1997, amending it some ten days later.  Beginning on January 27, 1997, Petitioner filed a series of *pro se* motions for new trial, but not until his motion of April 14, 1997 did he attack counsel's strategic decisions and claim that counsel was ineffective at trial.  On that same day, a post-trial

hearing was conducted upon counsel's motion, as amended, for new trial, along with Petitioner's *pro se* motions, with the exception of Petitioner's April 14, 1997 amended motion for new trial, which alleged that trial counsel was ineffective. At the outset of the hearing, the following colloquy occurred:

> MR. CROSS: It turns out as Your Honor probably knows I have filed a motion for new trial and an amendment thereto and Mr. Jones has filed a number of pro se motions most of which duplicate what I filed although there may be a slight variation in a place or two. He has filed something else as recently as this morning. I guess I do not have a copy of it, and he is alleging some things that may require me to file a motion to withdraw from the case. So . . .
>
> ....
>
> THE COURT: Let me say this, you know, the only way we can proceed on a motion for a new trial outside something that I can't even imagine or [sic] is for the attorney that tried the case to handle that, and I[sic] just not going to allow a person to pro se come in the middle of an already tried case and decide that they're going to start defending themselves. You know, if it's that bad later on there is a post-conviction relief or whatever available, but that makes no sense at all to-after the case is tried and the decision is made to have appointed counsel, or any counsel for that matter to have an individual defendant say, okay, I believe I can do a better job at this stage, I'll take over from here. I don't believe that's appropriate. I don't think the Court's required to do that, and you know, barring something, I mean, I guess you could have a situation where an attorney was found to be so corrupt or something that they should not proceed on, but I'm sure that in this case I would think they would be just be [sic] technical issues of some sort and I'll be happy to hear any motion he has, you know, to point out what problems he may have with counsel, but I'm not going to let him handle this case. Not at this point, that just doesn't make sense, Mr. Jones, I mean we can't do that.
>
> MR. CROSS: He's asking for continuance.
>
> ....
>
> THE COURT: I will do-the motion for new trial should be argued today. If there's some issue about counsel that he wants to raise in more detail later on he can do that, but really and truly that's-you know, I don't-I guess he really can't do that because, well, at some point along the way when this thing truly goes up on appeal it's going to be too late to re-open, but I guess that he [sic] there would be enough time between now and whatever time he's asking to be heard on the issue of counsel that we can hear that later

and still keep it at trial level. I'd be willing to set aside any ruling on [sic] motion for new trial if there was substantial enough grounds to say that either should be able to argue additional points or have new counsel, so I think the best way to do [sic] is go ahead and hear the motion for new trial now. His matter will need to be assuming, let's just assume that you don't prevail, if you prevail then you've got a whole different ball game, but if you don't prevail on your motion for new trial there'll still be time for him to come before the Court and point out problems he may have with counsel and if they're legitimate we can still do something different....

....

THE COURT: Okay, Mr. Jones have a seat and we'll-you know, with regard is there anything, we'll just hear Mr. Jones' motion on counsel when he's ready to go. He doesn't want to hear that right now, is that the continuance he's asking for? I'm not going to continue, I've already said I'm not going to continue the motion for new trial, but if he has a problem he'll have a chance to argue his motion on counsel.

MR. JONES: It was amended motion in brief for-to a motion-to a new trial and it amended some allegations of ineffective and some other allegations that hadn't been brought up yet.

THE COURT: Okay, we'll let that be heard at another time, it's not appropriate to hear that right now.

(Addendum No. 4, pp. 2-6). The motion for new trial hearing proceeded with appointed counsel, and the motion was thereafter denied. Appointed counsel represented Petitioner on direct appeal through the application for permission to appeal to the Supreme Court of Tennessee. There is nothing to indicate that Petitioner pursued his amended motion for new trial or sought to represent himself on direct appeal.

Jones claims the trial court violated his due process rights by failing to accept, hear, or grant his *pro se* motion for a new trial wherein he alleged ineffective assistance of counsel. The state appellate court began analyzing this claim in terms of substitution of counsel because Petitioner was represented by Mr. Cross at the time he filed the motion.

The state appellate court explained that trial courts are not required to set aside prior appointments of counsel and appoint new counsel in the absence of good cause, Tenn. Code Ann. § 40-14-205, and when an accused seeks to substitute counsel, the accused has the burden of establishing that counsel's representation is ineffective. Whether a defendant is entitled to substitution of counsel rests in the sound discretion of the trial court. Petitioner did not file a motion to substitute counsel. Nevertheless, the appellate court concluded that although the trial court failed to adequately inquire into the Petitioner's allegations of ineffective assistance, under the facts of this case, a more favorable result would not have occurred had the ineffective allegations been entertained. The appellate court, recognizing that Tennessee case law extends the Sixth Amendment right to proceed *pro se* to a motion for new trial, s*ee State v. Gillespie*, 898 S.W.2d 738, 741 (Tenn.Crim.App. 1994), specifically concluded that "[n]othing in the record remotely suggests that the Petitioner proceeding *pro se* or with substitute counsel would have obtained a new trial or more lenient sentence. . . . We therefore conclude that the trial court did not commit reversible error in refusing to allow the Petitioner to discharge his attorney for purposes of presenting the post trial motion based on ineffective assistance." *Jones v. State*, 2006 WL 1626931, *12.

In the instant case, Petitioner allowed Mr. Cross to represent him at trial. By so doing he demonstrated that he was no longer asserting his right to represent himself. On the date of the hearing for new trial, Petitioner filed a *pro se* motion and brief in support for new trial, claiming counsel was ineffective based on strategic decisions (Addendum No. 1, pp. 130-142). However, Petitioner's expressed dissatisfaction with his attorney is not

tantamount to a request to self-represent. *See United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994) (stating that the mere expression of dissatisfaction with trial counsel's performance is not a motion to proceed *pro se*, but instead would be understood as an appeal to the trial court's discretion to substitute counsel). Petitioner did not file a motion to represent himself on the motion for new trial but rather filed *pro se* amended motions for new trial, as did his counsel, prior to and on the date of the motion hearing. Petitioner's amended motion for new trial attacking trial counsel's strategic decisions was untimely and the trial court so found. Furthermore, just as it is in the trial court's discretion to accept or deny a motion to substitute counsel, it is also in its discretion to accept or deny an assertion of the right to self-representation made after a trial has commenced. Accordingly, not only does the Court not find that Petitioner unequivocally asserted his right to self-representation, the Court does not find that the trial court's decision to not permit Petitioner to proceed *pro se* during his motion for new trial to be unreasonable or contrary to Federal law.

Although *Faretta v. California* established that a criminal defendant has a constitutional right to conduct his own defense at trial when he voluntarily and intelligently elects to proceed without counsel, that right does not extend to direct appeal. *See Martinez v. Court of Appeal of California, Fourth*, 528 U.S. 152, 163 (2000). The *Martinez* court observed that its holding did not preclude a state from recognizing such a right under their own constitution, but did not specifically conclude that a criminal defendant has a constitutional right to represent himself at a motion for new trial. And even though Tennessee has done so—by extending the right of self-representation to a motion for new

trial, as well as sentencing—and assuming that such a right exists in the Constitution, which the Court does not find–Petitioner, having failed to seek self-representation during his new-trial motion in a timely and unequivocal manner, did not truly assert it.

The Court observes that the trial court informed Petitioner that if counsel did not succeed on the motion for new trial, he could "come before the Court and point out problems he may have with counsel and if they're legitimate we can still do something different." (Addendum No. 4, p. 5). Petitioner has not demonstrated that he pursued the matter and the Court's review of the record does not reveal that he pursued the matter.

Be that as it may, it remains that there is no Supreme Court case which holds that the right of self-representation exists at a motion for a new trial. Given the lack of such a governing rule from the Supreme Court, especially under the particular circumstances here — where a defendant has been represented by counsel in all prior proceedings, and he did not file a motion for self-representation, but rather, filed an amended motion for new trial alleging ineffective assistance of trial counsel on the date of the hearing on the motion for new trial—Petitioner has not demonstrated that the state court's decision was an unreasonable determination of the facts or was contrary to or an unreasonable application of Supreme Court precedent.

Accordingly, Respondent's motion for summary judgment on Petitioner's claim that the state trial court failed to permit him to discharge trial counsel and proceed *pro se* on a motion for new trial based on ineffective assistance of counsel will be **GRANTED** and this claim will be **DISMISSED**.

3.    *Self-Representation at Post-conviction Proceedings* (Habeas Petition Issues # 1 and 2)

Next, Petitioner claims his Sixth Amendment right to self-representation was violated during his state post-conviction hearing when the state court prevented him from discharging his attorney and proceeding *pro se*.[1] Petitioner maintains that he was prompted to fire his lawyer by counsel's refusal to raise the claims Petitioner wished to raise, which resulted in the waiver of those claims. Petitioner contends these rulings by the state post-conviction court denied him his constitutional right to due process.

There is no constitutional right to post-conviction review, *Lackawanna County Dist. Attorney v. Coss*, 532 U.S. 394, 403 (2001); likewise, there is no constitutional right to post-conviction counsel. Thus, neither claims of denial of post-conviction review nor claims of ineffective assistance of counsel during collateral post-conviction proceedings  can be a ground for relief in a § 2254 proceeding. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted). Petitioner's claim that the post-conviction proceeding in his case was flawed when the trial court failed to permit him to fire counsel[2]

---

[1]    Although Petitioner has cloaked this claim in terms of an unconstitutional post-conviction statute, the claim amounts to an attack on counsel's representation and the court's decision not to allow Petitioner to discharge his state post-conviction counsel, and the state courts addressed it as such. Nevertheless, as post-conviction relief procedures are not constitutionally mandated, *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987), such an attack is not cognizable in this proceeding. Moreover, and contrary to his assertion, Petitioner has not demonstrated that Tennessee's Post-Conviction Act is unconstitutional.

[2]    The Court observes that although the United States Supreme Court has concluded that historical evidence supports its holding that a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so, *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court has also concluded that historical evidence does not provide any support for an affirmative constitutional right to appellate self-representation. *Martinez v. Court of Appeal of California, Fourth Appellate Dist.* 528 U.S. 152, 159 (2000). The *Martinez* Court noted the Sixth Amendment identifies

and make an offer of proof on the issues he wished to raise does not constitute grounds for federal habeas corpus relief. *Id.* at 752-53 (petitioner bears the risk of state habeas attorney's error that results in a procedural default).

In addition, the Court observes that Petitioner asserted his right to self-representation after the post-conviction hearing was under way, and the Supreme Court has recognized that "most courts" have interpreted *Faretta* to require a defendant to assert his right to self-representation "in a timely manner." *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000)), and citing *Wood v. Quarterman*, 491 F.3d 196, 201-02 (5th Cir.2007); *United States v. Edelmann*, 458 F.3d 791, 808 (8th Cir.2006); *United States v. Young*, 287 F.3d 1352, 1353-55 (11th Cir.2002); *United States v. Martin*, 25 F.3d 293, 295-96 (6th Cir.1994); *United States v. Brown*, 744 F.2d 905, 908 (2d Cir.1984); *United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir.1979). Thus, a defendant's right to represent himself "is sharply curtailed" once a trial has begun and "[t]here must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance." *United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 15 (2nd Cir. 1965).

In *Robards v. Rees*, 789 F.2d 379, 383 (6th Cir. 1986) the United States Court of

---

the basic rights that an accused enjoys in "all criminal prosecutions" and "[t]he right to appeal, as we presently know it in criminal cases, is purely a creature of statute." *Id.* (quoting *Abeny v. United States*, 431 U.S. 651, 656 (1977). The Court concluded, "[i]t necessarily follows that the Amendment itself does not provide any basis for finding a right to self-representation on appeal." *Id.* Likewise, the Sixth Amendment does not provide that post-conviction is a basic right that an accused enjoys in all criminal prosecutions. Post-conviction is purely a creature of statute, thus, by analogy, it appears that the Sixth Amendment does not provide any basis for finding a federal constitutional right to self-representation during post-conviction proceedings.

Appeals for the Sixth Circuit declined to find constitutional error in the denial of a request for self-representation made on the day of trial after the clerk had called the roll of jurors. In addition, the *Robards* court concluded that if it had honored Robards' request for self-representation, the commencement of trial would have been impermissibly delayed. *Id.* at 384. Consequently, after the initiation of meaningful proceedings tardiness alone appears to be sufficient grounds for denying a motion for self-representation. *See United States v. Conteh*, 234 Fed.Appx. 374, 381 (6th Cir. 2007), *available in* 2007 WL 1229043, at *4 (motion for self-representation filed after trial began was untimely and denial was not abuse of discretion); *United States v. Pleasant*, 12 Fed.Appx. 262, 266-67 (6th Cir. 2001), *available in* 2001 WL 391969 (denial of self-representation on day of trial with prospective jurors standing outside courtroom, not abuse of discretion); and *United States v. Martin*, 25 F.3d 293, 295-96 (6th Cir. 1994) (invocation of self-representation must be timely); *but cf. Moore v. Haviland*, 531 F.3d 393, 401 (6th Cir. 2008)(Because that the trial judge backed off his expressed initial concern as to the timeliness of the request for self-representation and told Moore to writ him a letter of his proposed self-representation, the Sixth Circuit concluded that because the trial judge did not engage Moore in a *Faretta* colloquy upon reading the letter, he unreasonably applied *Faretta*).

Finally, Petitioner has not cited, nor has the Court's research revealed, Supreme Court precedent instructing that denial of a motion for self-representation made during trial or during post-conviction evidentiary proceedings is an abuse of discretion. Petitioner requested to invoke his right to self-representation at the end of the post-conviction proceedings and the trial court denied the request because he had previously invoked his

right to counsel at trial. The court concluded he did not have the right "to jump up and do anything [he] wanted to or submit proof that [his] counsel [didn't] think [was] in [his] own best interest." [Addendum No. 13, p. 119]. Consequently, the denial of Petitioner's motion for self-representation, which he made during his post-conviction evidentiary hearing, was neither contrary to nor an unreasonable application of clearly established federal law.

In addition to failing to demonstrate the state court's denial of his request for self-representation was contrary to or an unreasonable application of clearly established federal law, Petitioner is not entitled to habeas relief on this claim because it represents an attack on a proceeding collateral to detention of appellant and not on the detention itself. Accordingly, Petitioner's claim attacking the post-conviction court's denial of his request to represent himself will be **DISMISSED**.

### B.    <u>Ineffective Assistance of Counsel</u> (Petitioner's Issue #3)

As he did in his *pro se* post-conviction pleadings, Petitioner raises numerous alleged instances of trial counsel's ineffectiveness. However, post-conviction counsel narrowed the claims to those upon which he presented proof during the state post-conviction hearing, and thereafter the state post-conviction court and the state appellate court reviewed only those claims. As explained in section F. *infra,* in this Memorandum, Petitioner has failed to demonstrate cause and prejudice to overcome his procedural default. Therefore, the Court will address only those alleged instances of ineffective assistance adjudicated by the state court, because federal review is barred on the procedurally defaulted claims. Although it does not appear that Petitioner has raised all the ineffective assistance of counsel claims as addressed by the state post-conviction court, the Court will,

nevertheless, analyze those claims addressed by the state post-conviction court.

*Applicable Law*

To obtain relief, Petitioner must show that the state court's adjudication resulted in a decision that involved an unreasonable application of clearly established Federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). As the Sixth Circuit has observed, "a federal court may not grant a writ of habeas corpus 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable.'" *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)),. *cert. denied*, 540 U.S. 1164 (2004). Furthermore, Federal courts must defer to state court factual findings, according them a presumption of correctness that the petitioner may rebut only with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Supreme Court, in *Strickland v. Washington,* 466 U.S. 668 (1984), established the criteria for determining whether a Sixth Amendment claim of ineffective assistance of counsel is meritorious. The *Strickland* test requires that a defendant demonstrate two essential elements: (1) counsel's performance was deficient, *i.e.,* counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense, *i.e.,* deprived the defendant of a fair trial rendering the outcome of the trial unreliable. *Id.* at 687-88.

There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance and that conduct cannot be viewed in hindsight, but

must be evaluated for reasonableness within the context of the circumstances at the time of the alleged errors. *Strickland,* 466 U.S. at 689-90. A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir. 1994).

To establish the prejudice prong, Petitioner must show that absent his attorney's errors, there is a reasonable probability that the result of his trial would have been different. *Lynott v. Story,* 929 F.2d 228, 232 (6th Cir. 1991). "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *quoting Strickland v. Washington,* 466 U.S. at 690. "An error of counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *Id.* at 691.

### 1. Conflict of Interest

Petitioner contends his trial attorney's former representation of Mrs. Charlotte Fults, who testified as a prosecution witness against him during his trial, created a conflict of interest. During the post-conviction evidentiary hearing, David Fults, Charlotte Fults, and Mr. Cross testified concerning Mr. Cross' representation of them.

According to that testimony, on October 22, 1996, during the ten-week interval after Mr. Cross's appointment as Petitioner's counsel but before the trial, a search warrant was executed at the Fultses' residence while Mr. Fults was at work. During the search, Don Earle a Special Agent with the Tennessee Alcoholic Beverage Commission told Mrs. Fults

that if she and her husband would meet at his office later that afternoon to answer some questions, he would take the case to the grand jury rather than arresting them that day.

Both Mr. and Mrs. Fults testified they phoned Mr. Cross, Petitioner's trial attorney, and he accompanied them to Agent Earle's office later that evening. Mr. Fults testified that, because he is uneducated, he paid Mr. Cross $100.00 to appear at Agent Earle's office to defend him (Addendum No. 12, pp. 34-35; 40). Mr. Fults further testified he did not discuss any further representation with Mr. Cross that night but that after he and his wife were indicted on the marijuana charges in March of 1997, he hired him to represent his wife (Addendum No. 12, pp. 35-40).

Mrs. Fults testified that she and her husband had Mr. Cross accompany them to Agent Earle's office "to tell us what I guess, we should say or what not to say." (Addendum No. 12, p. 46). Mrs. Fults could not remember having any other conversation with Mr. Cross about the marijuana case until after they were indicted in March of 1997.

Mr. Cross' file indicated the first contact he had with Mr. and Mrs. Fults was April 3, 1997, and that, although he did not remember accompanying them to Mr. Earle's office or having any conversation with them about the facts of the marijuana case prior to Mr. Jones' trial, he could not dispute that such a contact occurred. Mr. Cross stated that if they really just needed someone to go to Agent Earle's office to "hold their hand" while they were talking to him, he would have done so without opening a file.

Nevertheless, Mr. Cross testified that even if he had accompanied them and then realized they were witnesses for Petitioner he would not have thought he had any conflict because the witnesses, including Mrs. Fults, were trying to be as helpful as they could be to Petitioner. When asked why he did not question Mrs. Fults about the possibility of a

future indictment, he responded "I don't think a charge looming on the horizon is something I can ask about[.]" (Addendum No. 12, pp. 60-69). Mr. Cross explained that he questioned Mrs. Fults as he did because:

> Charlotte Fults was already doing everything she could without - - I don't think she was being dishonest but I think she - - . . . she was going as far as she could to, I'm satisfied, without crossing the line into perjury, but she was doing everything she could to help Randy by that time.

(Addendum No. 12, pp. 71-72). In sum, Mr. Cross testified that Mrs. Fults was helping the defense as much as she could and he made the decision not to attack her memory or the amount of alcohol she consumed prior to Petitioner coming by on that day since she testified she never heard him say he had murdered or shot anyone. Mr. Cross did not consider her an unfavorable witness because she was trying her best not to hurt Petitioner when she testified (Addendum No. 12, pp. 73-77).

The state appellate court, citing *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980), observed that "[u]nless the petitioner can establish that his counsel 'actively represented conflicting interests,' he has not established the constitutional predicate for his claim."*Jones v. State*, 2006 WL 1626931, at *17. The court further observed that a conflict of interest will be established if the conflict is "actual and significant, not irrelevant or 'merely hypothetical.'" *Id*. However, prejudice is presumed if a conflict of interest is proven because there is a breach of loyalty in such cases.

The appellate court, agreeing with the trial court's finding of insufficient prejudice concluded there was no proof that an actual conflict existed. The appellate court reasoned that, even if they did presume trial counsel represented Charlotte Fults at the meeting with Agent Earle, there was no proof that such representation had any effect on his

representation of Petitioner. That representation was totally unrelated to the instant case and there is no proof of a continuing relationship between Mrs. Fults and counsel until she retained him following Petitioner's trial. Observing there was no proof presented that shared confidences were violated due to the representation, the appellate court concluded Petitioner established neither deficient performance nor prejudice. *Id*. at *18.

To demonstrate his attorney had an actual conflict of interest, Petitioner must demonstrate counsel "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland v. Washington*, 466 U.S. 668, 692 (1984). This is not a situation where counsel was representing co-defendants or where the outcome of Mrs. Fults' case was dependent on the testimony she provided during Petitioner's trial. Indeed, Mrs. Fults case was totally unrelated to Petitioner's case and the evidence reflects her case was *nolle prosequi*[3] as a result of her husband accepting responsibility for the marijuana found at their residence (Addendum No. 12, p. 49). Petitioner has not presented an actual conflict or that the conflict of interest, assuming without finding that there was one, adversely affected his lawyer's performance.

At Petitioner's trial, Mrs. Fults testified she heard him on the phone with some unidentified person stating that the person better get rid of the gun or that person would be caught up in a shooting or murder or something and that the gun was missing from his grandfather's place (Addendum No. 3, pp. 495-97). On cross-examination Mrs. Fults testified she had consumed five or six beers that day (she had previously testified Petitioner came by before they ate lunch) and that Petitioner never said he murdered or

---

[3] "A *nolle prosequi* is a formal entry in the record by the prosecuting officer by which he declares that he will not prosecute the case further." *Black's Law Dictionary* 945 (5th ed. 1979).

34

killed anybody.

There is nothing in the transcript which suggests that counsel's cross-examination was based on an actual conflict of interest impairing Petitioner's defense. Counsel explained that his decision not to attack Mrs. Fults' memory on the basis of intoxication was a strategic decision since she testified Petitioner never said he killed or murdered anyone.

In sum, there is no evidence that Mr. Cross had an actual conflict of interest. Although Mr. Cross had no recollection of accompanying Mrs. Fults to Agent Earle's office, there is no evidence he simultaneously represented Mrs. Fults as she was not arrested at that time; the search warrant was not issued in her name, rather it was issued in her husband's name; and she was indicted after Petitioner's trial concluded. Additionally, there is no proof the indictment was dismissed based on her testimony or cooperation in Petitioner's case. Rather, the evidence before the Court demonstrates her case was dismissed because her husband accepted responsibility for the marijuana found by Agent Earle.

The Court concludes that not only has Petitioner failed to demonstrate counsel had an actual conflict of interest, he has also failed to demonstrate counsel was ineffective or that he suffered any prejudice as a result of counsel's representation of Mrs. Fults. Accordingly, the state court's decision is not based upon an unreasonable determination of the facts nor is it contrary to or an unreasonable application of federal law. This claim will be **DISMISSED**.

2.    *Impeachment Evidence* (Petitioner's Claim 3.Q)

Petitioner argues that trial counsel was ineffective for failing to notify the State that two witnesses had repudiated their statements.  As a result, the prosecution was permitted to introduce the witnesses's prior statements into evidence.   Trial counsel admitted he knew the testimony of Danny Jones and Mary Perry was going to be somewhat weaker on the stand than it was when they were interviewed by the police, but he was not exactly sure what they would say, even though he thought their testimony was fairly "wobbly."  Petitioner argues that, under state case law, if counsel had notified the state that these two witnesses repudiated their previous statement, the prosecution would have been prohibited from referring to their prior statements to law enforcement.  As a result of counsel's failure to notify the state's attorneys, they were permitted to impeach these witnesses with their prior inconsistent statements.

The post-conviction court concluded the attorney's decision not to notify the state was a strategic decision because the more favorable testimony was helpful.  The appellate court disagreed, reasoning that such a finding implies counsel was aware the witnesses would repudiate their pre-trial statement and that, if counsel was aware that the witnesses would renounce their earlier statements, then his failure to notify could not have been a tactical decision since notification to the state would have precluded admissibility of the statements.   The appellate court, apparently concluding that such performance was deficient, found no resulting prejudice since the Fultses' testimony established proof of the

*corpus delicti*.[4]

The record supports this finding.   Mr. Fults testified that Petitioner asked him if he found a gun at Whispering Pines and, when he responded he had not, Petitioner told him it "needed to be melted down or something, he'd shot somebody with it. . . . [and Neecie said] yeah, he did , he really did."  (Addendum No. 3, p. 404-405).  Mr. Fults also testified that during a subsequent conversation Petitioner told him he shot the male victim and Asbury shot the female victim.  Mrs. Fults testified consistently with her spouse.  This testimony, along with the bodies of the victims, established the proof of the *corpus delicti*.  Therefore, even if counsel was deficient for failing to notify the state that two of the witnesses were repudiating their statements, there was no resulting prejudice because the testimony of the Fults, along with the bodies of the victims, established Petitioner's guilt.

Accordingly, the state court did not unreasonably determine the facts or unreasonably apply *Strickland* by rejecting the ineffective assistance of counsel claim upon its finding that counsel's failure-to-notify error, while constituting a deficient performance, had not resulted in prejudice.  *See Strickland*, 466 U.S. at 697 (where a court finds a petitioner has made an insufficient showing as to either deficient performance or prejudice, the claim may be disposed of without addressing the other prong).  Petitioner is not entitled to any habeas relief on his claim, and it will be **DISMISSED.**

---

[4]        "In a derivative sense, the substance or foundation of a crime; the substantial fact that a crime has been committed.  The 'corpus delicti' of a crime is the body or substance of the crime, which ordinarily includes two elements: the act and the criminal agency of the act."  *Black's Law Dictionary* 310 (5th Edition 1979).

### 3.    Failure to Call a Witness

Petitioner complains that trial counsel was ineffective for failing to call Crystal Nunley to testify.  Petitioner claims Ms. Nunley would have testified that Mr. Caldwell, one of the victims, had indicated the note implicating Petitioner was only a joke.  Petitioner argues that the testimony would have favored the defense and that the witness was being threatened by the State in an effort to coerce her not to take the stand.

Mr. Cross testified he interviewed Ms. Nunley at length but thought that the hearsay rule would bar her testimony.  In addition, counsel expressed his concern about Ms. Nunley's credibility, stating that  "there would have been a pretty significant bias against using, in my mind, against using this particular witness. . . . Some of the things she said could not be squared with other things that were [sic] almost had to be taken as facts in the case." (Addendum No. 12, pp. 106-109).

Ms. Nunley testified, during the post-conviction proceeding, that she had met the victim once before he died and that, on that occasion, the victim was mad and "raising Cain" because Petitioner was being blamed for the theft of his property, even though Petitioner had been with him all day.  According to Ms. Nunley, this man—whom she had only met once prior to his death—had several phone conversations with her about the theft of his property and he had no animosity or anger toward the Petitioner because they had been together all day and were best friends (Addendum No. 12, pp. 130-32).

The state appellate court declined to second guess tactical choices made by trial counsel (an implicit finding of no deficient performance) and concluded Petitioner had failed to show prejudice since, on appeal, he had been "'provided an opportunity to explain the note and denied any involvement in the burglary and theft[,]'" *Jones v. State*, 2006 WL

1626931, * 20.

Petitioner has failed to make a sufficient showing as to either of the two *Strickland* prongs. Given the presumption that counsel's conduct falls within the wide range of reasonable professional assistance and is sound trial strategy, *Strickland,* 466 U.S. at 689, counsel's decision not to present testimony from Ms. Nunley, based on his assessment of her credibility was within the range of professionally competent assistance. Therefore, absent any showing of a deficient and prejudicial performance, Petitioner is not entitled to any habeas relief on this claim, and it will be **DISMISSED**.

> 4. *Closing Argument* (Petitioner's Claim 3.Y)

Petitioner contends trial counsel was ineffective when he made the following statements toward the end of his closing argument:

> We can't eliminate the possibility that this man was involved. I cannot sit here and eliminate it altogether. If you vote for acquittal you are going to be taking some chance of freeing a guilty man, some chance. But I submit to you that if you vote for conviction you are going to be taking a much bigger chance that you are sending an innocent person to the penitentiary for the rest of his life.

(Addendum No. 10, p. 912). This argument comprised a single paragraph of a fifteen-page closing argument. Counsel was arguing, in essence, that the State's case was weak; that it lacked scientific evidence; and that the State was obliged not simply to do its best to prove Petitioner committed these murders beyond a reasonable doubt, but to actually provide that degree of proof. Counsel argued that one person alone did not commit the crime and although he could not eliminate the possibility that Petitioner was involved (there obviously was sufficient evidence to convict him), based on the evidence they were taking a very big chance of convicting an innocent person.

39

During post-conviction proceedings counsel explained:

I think it's important in a jury argument to level with the jury, and I think you lose some of your impact with the jury if you make to them, if you give to them a statement that's all encompassing, too broad, they're going to tune you out. Obviously, there was evidence in this case that would point in both directions. My objective was to acknowledge that, but then to argue that the better reasoned position would be to vote for not guilty.

Well, I thought that I certainly did go through and argue everything that would constitute a reasonable doubt. Personally, I think it's a mistake to make an assertion to the jury that they consider to be grossly overreaching. If I argued them that nobody but an absolute idiot could find the evidence here without - - that's a mistake. They're going to tune me out.

I think we've got to, you know, the proper way to argue the case is to argue that the better - - to admit that there is evidence pointing in both directions and then argue that the better reasoned evidence would support a not guilty verdict.

(Addendum No. 13, pp. 115-16).

The post-conviction court found this issue to be without merit concluding the statement was merely made in passing to create some reasonable doubt if the alibi was not accepted. The appellate court found no error and specifically concluded the argument did not render the verdict unreliable. Observing that counsel is permitted great latitude during closing arguments, the appellate court concluded Mr. Cross acted within the range of competence demanded of attorneys in criminal cases during closing arguments and thus, the claim was without merit.

Counsel's strategic decision to concede certain facts, to maintain credibility with the jury is reasonable under the performance prong of *Strickland*. *See Clozza v. Murray*, 913 F.2d 1092, 1099 (4th Cir. 1990) ("The strategy to maintain credibility with the jury was reasonable . . . Given that these remarks were largely attributable to trial strategy, we cannot, in keeping with *Strickland*, second-guess counsel's tactical choices."); *see also*

*Valenzuela v. United States*, 217 Fed.Appx. 486 (6th Cir. Feb. 16, 2007), *available at* 2007 WL 505783 (partial admission was reasonable trial strategy in light of government's substantial evidence); *Bell v. Evatt*, 72 F.3d 421, 428 (4th Cir.1995) ("It was important for the defense to retain some credibility . . . the decision to concede his guilt was a rational one..."); *also see Hayes v. Cain*, 272 F.3d 757, 762 n. 12 (5th Cir. 2001) ("Where counsel acknowledges, in closing argument, the overwhelming weight of evidence that has been admitted against this client, even conceding his client's guilt, we have found that such an acknowledgment of the obvious may be a trial tactic that does not reach the level of ineffective assistance.").

The excerpts about which Petitioner complains, when read in context, are reasonable trial strategy. Counsel did not concede Petitioner's guilt, rather he merely admitted the there was some evidence introduced against his client implicating him in the murders. Counsel specifically argued that although he could not completely eliminate the possibility that Petitioner was involved in the murders, that there was undoubtedly reasonable doubt as to Petitioner's guilt and they should find him not guilty. Petitioner's counsel did what he was supposed to do during closing argument—give the jury a broad summary of the evidence while briefly acknowledging damaging evidence and argue the theory of the defense. Counsel simply acknowledged that he was unable to totally eliminate the possibility that Petitioner was involved in the case.

Counsel did not concede Petitioner's guilt but rather, employed a reasonable trial strategy in light of the substantial evidence against him. Although the trial strategy ultimately proved unsuccessful, it presented the jury with, a plausible reason to acquit Petitioner. Thus, counsel's trial strategy did not amount to counsel conceding Petitioner's

guilt or in anyway prejudicing Petitioner.  Acknowledging there was proof implicating Petitioner was not ineffective on counsel's part, did not prejudice Petitioner, and does not warrant any relief under § 2254.

Petitioner's argument that defense counsel was constitutionally deficient during closing argument is rejected.  Accordingly, because, reviewing counsel's performance with a high degree of deference and without the distorting effects of hindsight, the Court finds counsel's concession or admission in his closing argument were part of a reasonable trial strategy, and additionally, because Petitioner has not demonstrated a "reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different," he is **DENIED** any relief on his claim that counsel rendered ineffective assistance of counsel during closing argument.  *Strickland*, 466 U.S. at 694.  This claim will be **DISMISSED.**

*5.    Use of Criminal Record*

Petitioner argues that trial counsel was ineffective for failing to impeach prosecution witness Freddie Meeks with his prior criminal record.  It appears that Mr. Meeks was on federal parole at the time of trial for theft charges relating to some stolen vehicles.  Mr. Meeks testimony, however, was not unfavorable to Petitioner.  Mr. Meeks testified that he had known the victim all of his life, he and the victim were best friends, and that, when he needed help, the victim worked for him (Addendum No. 3, p. 354).  Mr. Meeks also testified that Petitioner came to his house; that he said someone had told him where the victim's truck was located; that he [Meeks] believed they encountered the victim as they left the house; that the victim asked Petitioner how he knew the exact location of the vehicle; and

that Petitioner replied someone had told him. Although Mr. Meeks testified he had previously helped the victim look for his truck, he could not remember the exact date, but did not think it was the day they found it because he believed he had worked that day.

Trial counsel had interviewed Mr. Meeks and, during the post-conviction proceeding, testified Mr. Meeks was a reluctant witness for the state and regretted talking with the investigators. Mr. Cross, who had not read the transcript, was unsure as to why he did not question Mr. Meeks about his prior criminal record, but testified that he would have based his decision on whether Mr. Meeks credibility was "a focal point." (Addendum No. 13, p. 110).

When the issue was offered on appeal, the appellate court reviewed the witness's trial testimony and Mr. Cross's post-conviction testimony and concluded that Petitioner has not shown that any prejudice had resulted from his attorney's failure to introduce Mr. Meeks' prior record into evidence. *Jones v. State*, 2006 WL 1626931, at *21 (Tenn.Crim.App. June 9, 2006).

Given that Mr. Meeks' testimony did not disadvantage the defense, since he simply recounted details about locating the vehicle, transporting it to the victim's residence, and seeing the note shown to him by the victim, Petitioner has not demonstrated a reasonable probability of a different outcome at trial had counsel cross-examined Mr. Meeks about his federal conviction. Thus, the prejudice prong of the *Strickland* test has not been satisfied, and any deficiency of performance on the part of counsel which does not result in prejudice does not constitute ineffective assistance. The state court did not unreasonably determine the facts or unreasonably apply *Strickland* in so finding and, thus, habeas relief is not

justified with respect to this claim, and it will be **DISMISSED.**

### 6. *Hearsay Statements*

Petitioner claims counsel was ineffective for failing to object to certain hearsay statements during Mr. Wayne Fults' testimony. Mr. Fults testified at trial that when Petitioner said he had killed someone Ms. Laymon said "Yeah, he did, he really did." (Addendum No. 3, p. 405). When the state attempted to elicit the same testimony from Mrs. Fults, counsel objected and the trial court concluded the testimony was inadmissible hearsay. Thus, Petitioner argues counsel was ineffective for failing to object to Mr. Fults testimony.

The state appellate court concluded the significant testimony was Petitioner's statement that he had shot someone, not what Mrs. Laymon had said. The appellate court also observed that Ms. Laymon was given the opportunity to explain her statement in front of the jury. Concluding that Petitioner failed to demonstrate the verdict was unreliable based on the admission of hearsay testimony of Mrs. Laymon's statement, the court denied Petitioner post-conviction relief.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). It is undisputed that the challenged testimony was hearsay. As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. *See* Tenn. R. Evid. 802.

Moreover, a challenge to a state trial court's evidentiary ruling is a matter of state

law which is not subject to federal review. Violations of state law or procedure that do not infringe on a specific federal constitutional protection are not cognizable under 28 U.S.C. § 2254. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). In the instant case, there is no evidence that the alleged statement infringed on a specific federal constitutional right and counsel's failure to object does not undermine the Court's confidence in the jury verdict or render the result of the trial unreliable.

Mr. Cross said he suspects the reason he did not object is because it caught him by surprise and he figured the damage had been done and it would only be harmful to the defense if he had made it an issue. Petitioner does not advance any argument demonstrating why the state court's decision was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

Although hearsay was admitted during Petitioner's trial, there is no showing that it impinged on any constitutional right and there is no showing Petitioner suffered any prejudice from counsel's strategic decision to ignore the testimony after he was surprised by it. Thus, although the claim raises no more than an issue of state evidentiary law which is not subject to federal habeas corpus review, even it was properly before the Court, Petitioner's ineffective assistance of trial counsel for failure to object to hearsay testimony would be **DISMISSED** because he has not demonstrated prejudice.

### C.    Prosecutorial Misconduct (Issue 4)

Petitioner contends that the State committed prosecutorial misconduct by making improper comments during closing argument and improperly intimidate, threatened, and

coerced Crystal Nunley not to testify on behalf of Petitioner during his trial. The state appellate court concluded the claims had been waived twice—when not raised on direct appeal and when not presented in the post-conviction hearing by counsel[5]— and, alternatively, had no merit. If a state court denies a claim on the basis of a state procedural rule, and alternatively, on the merits, the claim will be considered procedurally defaulted. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

Federal courts "will not review questions of federal law decided by a state court if the decision of that court rests upon a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Since the appellate court determined Petitioner waived these claims, the doctrine of procedural default bars federal review. Petitioner has not demonstrated cause and prejudice or actual innocence to excuse his default; thus he is not entitled to any habeas relief.[6] Accordingly, Petitioner's prosecutorial misconduct claim will be **DISMISSED**.

### D. Jury Instructions (Issue 5)

Petitioner also complains that the trial court erred by failing to properly recharge the jury after it submitted the following question: "Can we use first degree murder on circumstantial evidence?" The trial court interpreted the question to mean: "Can we decide

---

[5]    Although counsel examined Ms. Nunley during the post-conviction evidentiary hearing, he did not inquire about any alleged prosecutorial misconduct of improperly influencing, coercing, threatening, and intimidating her.

[6]    Additionally, the Court observes that Petitioner has not demonstrated the state court's alternate finding that prosecutorial misconduct was not proven was based on an unreasonable determination of the facts or contrary to or an unreasonable application of federal law. To warrant relief, it must be proven that the prosecutor's conduct was so egregious so as to deny Petitioner a fundamentally fair trial. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Petitioner has not made such a showing.

first degree murder based on circumstantial evidence?" The trial judge, without objection from trial counsel but with a request that it be "subject to the qualifications in the charge," responded "You may decide any question of fact, including the ultimate guilt, based on direct evidence or circumstantial evidence, or any combination of the two." (Addendum No. 3, p. 948). The state appellate court noted the issue should have been raised on direct appeal; that it was not presented for determination in the post-conviction hearing; and, alternatively, that the supplemental instruction was an accurate statement of relevant law. Therefore this claim was procedurally defaulted, and is now barred from habeas review. *Harris*, 489 U.S. at 264 n.10.[7]

## E.    Cumulative Error (Issue 6)

In his final claim, Petitioner asserts he is entitled to habeas relief on the basis of the cumulative effect of all the alleged errors he has raised. The appellate court denied relief on this claim as it did not find any error. As the above analysis demonstrates, Petitioner has not shown the existence of a constitutional error at trial and is not entitled to habeas relief because there are simply no errors to cumulate. *See Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004) ("Because Baze cannot establish any errors to cumulate and because his theory that errors can be considered in the aggregate depends on non-Supreme Court precedent, this claim is also without merit.").

---

[7]    Additionally, the Court observes that the Supreme Court has instructed that the correct standard for reviewing a jury instruction is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990). Thus, to obtain habeas relief, Petitioner must demonstrate the alleged incorrect jury instruction was more than undesirable, erroneous, or universally condemned, but rather, taken as a whole, the instruction must be so infirm that it rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. at 72. Such a showing has simply not been made in this case.

Petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of established federal law as determined by the United States Supreme Court, or involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, Petitioner's cumulative error claim will be **DISMISSED**.

### F.    Procedurally Defaulted Claims

As explained *infra*, the remaining claims[8] will not be adjudicated by this Court as they were found to have been waived by the state courts or they have never been previously raised.  Petitioner contends he did not waive any claims but rather that state post-conviction counsel refused to present proof on those claims.  Respondent contends the state court's reliance on certain state procedural rules when rejecting some of Petitioner's claims bars federal review of those claims.

To rely upon procedural default, Respondent must show: (1) there is an applicable state procedural rule with which Petitioner failed to comply; (2) the state rule is one that is firmly established and regularly followed; and (3) the rule is an adequate and independent state ground which the state may rely upon to foreclose review of the federal constitutional claim.  *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001) (applying the four factor analysis identified in *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (After applying the four factors, if a state procedural rule was not complied with and  the rule was an adequate and independent state ground, then the court will not address the merits unless the defendant demonstrates cause for not following the procedural rule and that he was

---

[8]        The remaining claims are Petitioner's Issues 1, 2, and 3(all but the six claims of ineffective assistance of counsel addressed above), and 4 (all but the prosecutorial misconduct claim addressed above).

actually prejudiced by the alleged constitutional error).  Additionally, the state rule bars the claim only if the last reasoned decision of the state court invoked the rule as a basis for its decision to reject review of the Petitioner's federal claim.  *Id.*

Tennessee's post-conviction statute specifies types of procedural default that may bar the state court from reviewing the merits of a constitutional claim.  Petitioner's post-conviction proceedings were governed by Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 *et. seq*.  Tenn. Code Ann. § 40-30-106(g) provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented" unless one of two criteria, neither of which is applicable to Petitioner's case, are present.

During Petitioner's state post-conviction hearing, near the conclusion of the presentation of the proof, Petitioner stated he wished to fire his attorney because his attorney would not present all arguments contained in previously filed *pro se* pleadings. Counsel represented that he believed he had covered all issues which had substance and the Court did not require counsel to argue issues which he thought were baseless. Petitioner demanded that certain claims be raised at the state post-conviction proceeding, but the state court determined post-conviction counsel's chosen course of action of presenting only proof and argument on certain claims to be binding on Petitioner.  Tenn. Code Ann. § 40-30-106(g); *House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995) ("[W]e conclude that the rebuttable presumption of waiver is not overcome by an allegation that the petitioner did not personally, knowingly, and understandingly fail to raise a ground for

relief. Waiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of this attorney."); *Johnson v. State*, No. 02C01-9111-CR-00237, (Unpublished) *available at* 1997 WL 141887 (Tenn.Crim.App. 1997) (On remand from the Tennessee Supreme Court to reconsider in light of *House*, the appellate court concluded that "counsel's decisions, even those opposite the wishes of the petitioner, are imputed to the petitioner for the purposes of waiver."); *see generally Edwards v. United States*, 265 F.2d 909, 910 (6th Cir. 1959) (defendant represented by trial counsel of his choice, bound by counsel's strategic decisions), *cert. denied*, 361 U.S. 845 (1959).

Consequently, "[a]ttorney error short of ineffective assistance of counsel does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial. . . . [C]ause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). The Supreme Court has also explained that "default of a constitutional claim by counsel pursuant to a trial strategy or tactical decision would, absent extraordinary circumstances, bind the habeas petitioner even if he had not personally waived that claim." *Id.* at 487.

The Sixth Circuit has generally defined trial strategy as follows:

> [W]hen the decision to assert or to waive a right depends upon a time-sensitive assessment of a defendant's litigation position, a calculation that must ordinarily be made rapidly and in the heat of trial without any meaningful opportunity for consultation between counsel and a defendant, that decision is a matter of trial strategy.

*Watkins v.Kassulke*, 90 F.3d 138, 143 (6th Cir. 1996).

Moreover, to the extent Petitioner claims his procedural default is excused on the basis that his state post-conviction counsel was ineffective for failing to raise the claims Petitioner requested he raise, Petitioner is not entitled to habeas relief because "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(I). Thus, Petitioner's claim that he should not be bound by counsel's refusal to raise the claims in state court is unavailing.

The state appellate court decided these claims on the independent and adequate state ground of waiver which prohibited the state court from reaching the merits of the claim. *Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001) (Tennessee's waiver statute is independent and adequate state rule for denying state review of a constitutional claim under the *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986) analysis). That ruling erects an independent and adequate state procedural bar to prevent this Court from considering those claims. *Coe v. Bell*, 161 F.3d 320, 330 (Tenn. 1998). If the *Maupin* test is met, which it is in Petitioner's case, a federal court must determine whether the petitioner is able to meet the cause and prejudice test to excuse the state procedural default.

Consequently, Petitioner is barred by this procedural default from seeking federal habeas review of those claims which the state post-conviction counsel deemed not worthy to present during the state post-conviction proceeding. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). Even though the post-conviction trial court made an alternative ruling that there was no proof in any of the petitions to support a finding of ineffective assistance of counsel, the state appellate court decided these claims on the independent and adequate

state ground of waiver.  Moreover, an alternative holding does not require a habeas court to disregard the state court's finding of procedural bar.  *Id.* at 330.  Waiver is an adequate procedural rule; it is regularly followed; and it forecloses habeas corpus review, unless Petitioner can demonstrate both "cause" and "prejudice" for his failure to raise the claim in state court while state court remedies were available, or that a miscarriage of justice will result if the claim is not reviewed.  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000).  Any ineffectiveness on the part of post-conviction counsel will not provide cause to excuse the default because where there is no constitutional right to counsel there can be no deprivation of effective assistance if there is no right to it in the first place.  *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991) *citing Wainwright v. Torna*, 455 U.S. 586 (1982).  Though Petitioner cannot and does not argue his default is excused by cause and prejudice, he does maintain that a fundamental miscarriage of justice will result if his claims are not considered because he is actually innocent.

To demonstrate a miscarriage of justice, Petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent of the crime."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Murray*, 477 U.S. 478, 496 (1986)).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Schlup*, 513 U.S. at 327.  The fundamental miscarriage of justice exception applies only in extraordinary cases, *Murray*, 477 U.S. at 496.  This is not one of those cases.

Besides the fact that Petitioner has not identified any new evidence, his assertion

that he is actually innocent[9] is factually unsupported and cannot excuse his procedural default. *See Bousley v. United States,* 523 U.S. 614, 623 (1998) (defining "actual innocence" as factual innocence, not mere legal insufficiency) (citing *Schlup*, 513 U.S. at 327-28). Petitioner has failed provide any facts indicating he is actually innocent, thus, he has failed to demonstrate a miscarriage of justice. To sum up, Petitioner failed to comply with the "waiver" rule; the state procedural rule relied upon is a state law ground which is adequate and independent of federal law; Petitioner has failed to show "cause and prejudice" or a miscarriage of justice to avoid his procedural default; and federal review is now unavailable on these particular procedurally barred claims. Accordingly, the Court will not consider these procedurally barred claims.

To the extent that any of the fifty claims identified by Petitioner are being raised for the first time in his habeas petition, state procedural rules, specifically the "one-petition" rule and post-conviction statute of limitations, bar his return to the state courts to raise any unexhausted claims and this, too, constitutes a procedural default for purposes of federal habeas corpus review. *See Coleman v. Thompson*, 501 U.S. at 752-53.

---

[9]      Though not qualifying as proof and not considered in rendering this instant decision, questioning at the state post-conviction evidentiary hearing suggests that the opposite is true. For example, the prosecutor asked trial counsel if he was aware that, sometime after this trial, Petitioner's alibi witness notified law enforcement authorities that she had lied under oath in Petitioner's trial when she provided him with an alibi and Petitioner, himself, "gave a somewhat detailed statement to Sheriff Meeks admitting that his alibi defense was a lie and he was present when Mr. Caldwell and Mrs. Anderson were killed"(Addendum No. 12, pp. 101; 118).

**V.     CONCLUSION**

Having considered both parties' pleadings together with the state court record, including the brief and audio tape submitted by the State, for the above reasons, the Court finds no basis on which to grant the writ of habeas and, therefore, **GRANTS** Respondent's motion for summary judgment and **DISMISSES** the habeas petition.

An appropriate Judgment will enter.


                                                    _____*/s/Harry S. Mattice, Jr.*_____
                                                    HARRY S. MATTICE, JR.
                                                    UNITED STATES DISTRICT JUDGE